Counsel of Record:
Marc P. Berger
Lara Shalov Mehraban
Sandeep Satwalekar
Jorge G. Tenreiro
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,             :
                                                :
                           Plaintiff,           :    18 Civ. 6463
                                                :
              - against -                       :    ECF Case
                                                :
CENTOR ENERGY INC. and                          :    **COMPLAINT**
FREDERICK DASILVA,                              :
                                                :
                           Defendants.          :
---------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Centor Energy Inc. ("Centor" or the "Company") and Frederick DaSilva ("DaSilva"), alleges as follows:

## SUMMARY

1. From late 2013 through early 2014, DaSilva, the CFO and later CEO and President of Centor, made numerous materially false and misleading statements, and omitted certain material facts, about Centor's oil reserves, revenue prospects, and business dealings. These statements, authored, reviewed, and approved for dissemination by DaSilva, and for which

he was primarily responsible, appeared in numerous Centor press releases and on its website, as well as in Commission filings that DaSilva authored, reviewed, and approved for dissemination.

2.  Centor's stock price and volume increased substantially following the Defendants' false and misleading statements in the fall of 2013 and winter of 2014, going from $0.53 per share on November 26, 2013 to $2.96 a share on January 23, 2014.  On February 11, 2014, the Commission issued an Order suspending trading in the shares of Centor.

3.  DaSilva also failed to disclose that he and another Centor officer had entered into an agreement with the Company's prior management by which he and DaSilva had the immediate option to acquire a controlling interest in Centor's common stock.  To the contrary, in a public filing, DaSilva and Centor falsely disclaimed the existence of any such arrangement.

4.  By engaging in the conduct set forth in this Complaint, the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5(b) thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.  The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), seeking a final judgment:  (a) permanently enjoining the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein; (b) ordering Defendant DaSilva to disgorge ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendant DaSilva, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any public company; (d) prohibiting Defendant DaSilva, pursuant to Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A), from participating in an offering of penny stock; and

(e) imposing civil money penalties on DaSilva pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

7. Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Some of the transactions, acts, practices and courses of business occurred in the Southern District of New York and some of the victims reside here.

## DEFENDANTS

8. **Centor** is a corporation organized under the laws of the State of Nevada in 2011 as "Centor, Inc.," with a stated principal place of business in Winter Park, Florida.  Centor is purportedly engaged in the business of shale oil exploration, drilling and extraction in the east central region of the Canadian Province of Saskatchewan known as the "Pasquia Hills."  The Company changed its name to "Centor Energy, Inc.," effective January 2014.  The Commission suspended trading in Centor securities on February 11, 2014, prior to which Centor was quoted on OTC Bulletin Board and was a penny stock as defined under Exchange Act Rule 3a51-1.

9. **Frederick DaSilva,** age 55, resides in Alberta, Canada.  On February 13, 2013, DaSilva became Centor's Secretary, Treasurer, and Director.  DaSilva became Centor's CFO at some point in late 2013, and became its President and CEO in March 2014.

# FACTS

## I. Background

10. In early 2013, Centor purported to be in the business of exploring gold mine reserves in Africa.

11. Starting in approximately September 2013 and according to its public filings, Centor purported to be in the business of exploring and developing oil shale reserves and engaging in "exploration activities" on "mining claims in order to assess whether they possess commercially exploitable mineral deposits."

12. By December of 2013, Centor's principal assets were purportedly leases on acreage located in the Pasquia Hills area of central Canada (the "Region").

13. DaSilva first became associated with Centor in 2013. Starting in approximately September of 2013, DaSilva became responsible for Centor's filings with the Commission, which included authoring, reviewing, and approving them. He also authored the content on Centor's website and Centor's press releases, and had the ultimate authority to approve their contents and dissemination.

14. Pursuant to the terms of his contract with Centor, DaSilva was to be paid $6,000 per month as salary beginning on or around December 2013, and in fact received at least $7,500 in salary during the period relevant here.

## II. Centor and DaSilva's Misrepresentations about Centor and its Oil Shale Prospects

### A. Centor Enters into a Land-Lease Purchase Agreement.

15. On December 17, 2013, Centor entered into an agreement (the "Purchase Agreement") with a conglomerate of five companies (the "Conglomerate") to purchase certain leasehold interests over certain tracts of land within the Region (the "Lease Interests").

16. The Conglomerate consisted of five companies controlled by the same individual, a purported geologist resident of Alberta, Canada (the "Geologist").

17. The Conglomerate collectively owned 100% of the Lease Interests.

18. Under the terms of the Purchase Agreement, Centor purchased 55% of the Conglomerate's total 100% of the Lease Interests. Specifically, Centor purchased its interest from four of the five companies in the Conglomerate, and purchased none of the fifth company's interests.

19. The purchase price contemplated by the Purchase Agreement was $2.475 million in Canadian Dollars (approximately $2,330,000 in U.S. Dollars at that time), of which over $300,000 Canadian Dollars were due immediately to the Conglomerate.

20. Centor was able to make the initial payment due under the Purchase Agreement by obtaining a loan indirectly from an individual (the "Sponsor"). The Sponsor had introduced DaSilva to Centor and was responsible for DaSilva's hiring by Centor. The Sponsor also agreed to pay DaSilva's salary for work done on behalf of Centor.

21. The Purchase Agreement gave Centor an option to purchase an additional 11.66% of the Lease Interests. Centor had no rights under the Purchase Agreement, or otherwise, to the remaining 33.34% of the Lease Interests.

22. Prior to entering into the Purchase Agreement with Centor, the Geologist had prepared a report analyzing the potential recoverability of oil from the leases the Conglomerate held over the Lease Interests (the "Reserve Report"). On or around December 1, 2013, the Geologist reissued the Reserve Report to look as if it had been prepared on behalf of Centor.

23. In the Reserve Report, the Geologist estimated that the *entirety* of the Conglomerate's Lease Interests, *i.e.*, 100% of the interests, could hold up to approximately 1.1 billion barrels of oil.

      **B.**      **Centor and DaSilva Make Materially Misleading Statements about Centor's Reserves.**

24. In an effort to build interest in Centor and to create the appearance that Centor was moving quickly to developing an oil shale resource, Centor and DaSilva announced the Purchase Agreement in various documents and releases. These materials contained false and misleading statements about Centor's oil shale prospects and reserves, and omitted material facts about how Centor and DaSilva had arrived at their projections about Centor's oil shale prospects and reserves.

25. On December 18, 2013, Centor issued a press release (the "December Press Release"), authored and approved by DaSilva, announcing Centor's execution of the Purchase Agreement and proclaiming that Centor was about to develop "oil shale resources with over 1.1 billion barrels of recoverable oil."

26. The December Press Release explained that the 1.1 billion barrels estimate was "based upon analysis of previously completed geological surveys, core drilling programs and laboratory testing" and referred to the Reserve Report.

27. Around the same time, DaSilva spearheaded the preparation and publication on Centor's website of a PowerPoint Presentation (the "Presentation") that contained similar statements, including, specifically, that the leases Centor had purchased contained approximately 1.185 billion barrels of recoverable oil.

28. The Presentation, which DaSilva directed be published on Centor's website, also stated that Centor held "an option to acquire the remaining 45% interest" in the Lease Interests held by the Conglomerate.

29. The Purchase Agreement and December Press Release were also attached as exhibits to a Form 8-K that Centor filed with the Commission on January 8, 2014 (the "January 8-K"), and were also posted on Centor's website at DaSilva's direction.

30. The December Press Release, the Presentation, and the January 8-K were materially false and misleading. As DaSilva knew or recklessly disregarded, the 1.1 billion barrels of oil estimate was based on the Reserve Report's estimate of the Conglomerate's *entire* Lease Interests, of which *Centor only owned 55%*. The true number of barrels of oil Centor could realistically expect to recover (even assuming the accuracy of its own projections) was therefore materially lower than 1.1 billion barrels.

31. The Presentation also falsely stated that Centor had entered into an agreement to purchase the remaining 45% of leasehold interests over the Region from the Conglomerate. As DaSilva knew or reckless disregarded, the Purchase Agreement covered only an additional 11.66% (such that Centor could at most hope to acquire 66.66% of the Lease Interests) and there was no other agreement that covered the remaining interests.

32. Nor did Centor or DaSilva disclose in the December Press Release or in the Presentation that the Reserve Report indicated that the study of the Lease Interests was incomplete, in that no individual connected to the Reserve Report had conducted a field test or even visited the Lease Interests to test some of its assumptions about geological conditions.

33. Indeed, DaSilva, who had not read the Reserve Report, failed to make any attempt to verify the assumptions, calculations, and conclusions made in the Reserve Report, and

accordingly had no good faith basis to make any projections about Centor's prospects purportedly drawn from the Reserve Report.

34. The Presentation was also misleading because it (a) repeated many of the untested favorable assumptions made in the Reserve Report (such as that the Region had low overburden providing easy access to the oil shale); and (b) contained other false statements such as that the Region was located in an area with "established infrastructure" such as roads and railroads.

35. In fact, as DaSilva knew or recklessly disregarded, the favorable assumptions in the Presentation had not been verified and were untested; the nearest small town to the Region was over 71 miles away; and there was no main road or railroad running to the Region.

C. **Centor and DaSilva Make Materially Misleading Statements and Omissions about the Geologist's and the Sponsor's Ongoing Involvement with Centor.**

36. The Presentation posted on Centor's website touted the existence of the Reserve Report in an effort to build interest in Centor and to create the appearance that Centor had marketable oil shale prospects.

37. The Presentation falsely stated that the Reserve Report had been prepared by an "independent technical advisor" to Centor.

38. In reality, the Reserve Report had been prepared by the Geologist, who had sold the Lease Interests to Centor and who still held the remaining 45% of the Lease Interests. Accordingly, the Geologist was not independent of or disinterested in Centor.

39. Reasonable investors in Centor would have wanted to know that the basis for Centor's optimistic projections about its oil prospects was a report prepared by the same person who was selling interests in the same lands that were the subject of the Reserve Report.

40. Approximately two weeks after the Presentation was published on Centor's website, on January 3, 2014, Centor issued a press release (the "January Press Release"),

8

authored and approved by DaSilva, stating that it was announcing the appointment of the Geologist to Centor's advisory board.  The January Press Release also failed to disclose that the Geologist had prepared the Reserve Report, had sold the Lease Interests to Centor, and held the remaining 45% of the Lease Interests.

41.     Further, DaSilva and Centor also filed a Form 8-K on February 2, 2014 (the "February 8-K"), announcing that Centor had secured $1.25 million in financing from a British Virgin Islands corporation (the "Financing Corporation"), which it would then use to develop and explore the leasehold interests that Centor had acquired under the Purchase Agreement.

42.     But Centor and DaSilva knew, or recklessly disregarded, that the February 8-K failed to disclose a material fact to readers: that the individual who controlled the Financing Corporation was the Sponsor—*i.e.*, the same individual who had orchestrated DaSilva becoming the CFO of Centor in the first place, who had financed Centor's payments of the leasehold interests under the Purchase Agreement, and was indirectly paying DaSilva's salary at Centor.

**D.     DaSilva's False Statements about his Controlling Interest in Centor's Shares.**

43.     On September 15, 2013, DaSilva entered into an agreement that gave DaSilva the right to immediately purchase 30 million shares of Centor common stock at a fixed price of $40,000 (or $0.0013 per share) from previous Centor officers who then held that amount of Centor stock.  A parallel agreement, of which DaSilva was aware, simultaneously gave a different Centor officer the same rights with respect to an additional 9,000,000 shares of Centor common stock at a fixed price of $5,000 (or less than $0.0006 per share).  A total of 39 million of Centor's approximately 69 million shares were the subject of these two agreements.

44.     On December 12, 2013, Centor filed with the Commission and distributed to Centor common stockholders a disclosure form to inform them of an upcoming shareholder

meeting to consider, among other things, changing the name of the Company from Centor to Centor Energy, Inc.

45. This disclosure, which DaSilva reviewed and approved for dissemination, falsely stated that "to Centor Energy Inc.'s knowledge" DaSilva held zero shares of Centor stock as beneficial owner and that "to the knowledge of management, there are no present arrangements or pledges of securities of Centor Energy, Inc., which may result in a change in control." These statements were false because, as DaSilva knew or recklessly disregarded, the September 2013 agreements, which gave him and another office the option to purchase a combined 39 million shares of Centor common stock, constituted such an arrangement.

46. Reasonable investors would have wanted to know that DaSilva had an option to purchase 30 million shares of Centor stock at a fixed price, such that any increase in the price of Centor's stock would be beneficial to DaSilva.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
(DaSilva and Centor)

47. The Commission repeats and realleges paragraphs 1 through 46 of its Complaint.

48. By virtue of the foregoing, the Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49. By virtue of the foregoing, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b);

**II.**

Directing Defendant DaSilva to disgorge all ill-gotten gains, including prejudgment interest thereon;

**III.**

Permanently barring Defendant DaSilva from serving as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2);

**IV.**

Prohibiting Defendant DaSilva from participating in an offering of penny stock pursuant to Section 21(d)(6)(A) of the Exchange Act, 15 U.S.C. § 78u(d)(6)(A);

**V.**

Directing Defendant DaSilva to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and

## VI.

Granting such other and further relief as the Court deems just and appropriate in the public interest pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

Dated: New York, New York
July 17, 2018

SECURITIES AND EXCHANGE COMMISSION

By: _____
Marc P. Berger
Regional Director

Lara Shalov Mehraban
Sandeep Satwalekar
Jorge G. Tenreiro
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov
*Attorneys for Plaintiff*